HARRIS v. ROYAL OAK SAVINGS BANK.

NEGLIGENCE—INFANTS—PARENT AND CHILD—PERSONAL INJURIES—SIGNS.

Where plaintiff, an infant, accompanied his mother upon an occasion when she entered defendant bank on business

and with his brother went to and attempted to look out of the window to observe some passing occurrence and, raising himself by means of a sign that defendant maintained in the window, caused the same to tip over upon himself and the other child, evidence that plaintiff's father afterwards looked to ascertain what fastenings there were, and discovered none, tended to sustain his claim of negligence and justified the trial court in submitting it to the jury.

Error to Oakland; Smith, J. Submitted June 23, 1915. (Docket No. 58.) Decided July 23, 1915.

Case by Donald M. Harris, an infant, by his guardian, Charles W. Harris, against the Royal Oak Savings Bank for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Perry & Lynch,* for appellant.
*Andrew L. Moore,* for appellee.

MOORE, J. This is a personal injury case. Upon the trial the defendant offered no testimony. From a verdict and judgment in favor of the plaintiff in the sum of $800 the case is brought here by writ of error.

Counsel are agreed that the only question is: Was there such proof of the negligence of defendant as to justify the submission of the case to the jury? The testimony offered on the part of the plaintiff was in substance that the mother of the plaintiff went into the bank of defendant about 9 o'clock one morning to do business, accompanied by the plaintiff, who was something more than two years old, and another child nearly five years old. We quote from the record:

"When I entered the bank, there were in the lobby of the bank, as near as I can recall, three persons. * * *

"*Q.* So that, when you went into the bank, did you

go directly to the cashier's window to transact some business?

"*A.* I did, because I waited my turn. I went within possibly four or five feet of the window and was waiting. The entrance to the building is on the northwest corner, and the front of the building faces to the west. All of the windows in the front of the building are south of the door. While myself and the two children were waiting, we were about in the center of the room, as near as I can remember. The children were with me until they were attracted by an occurrence across the street. A couple had been married in the Catholic church that morning, and had come up from the church to the corner on the street immediately opposite the bank to take an electric car, and several people were with them. * * *

"*Q.* State what occurred—just what you saw the children do, and what happened.

"*A.* I was looking out of the window to see those people waiting for the car, and the children were anxious to know what was going on, and went to the window, and not being tall enough to look over the large sign sitting on the sill, the oldest boy put his hand on it, on top of it, and raised himself up on his tiptoes and looked over, and as he raised up the sign tipped over and fell upon both children, catching them both."

On cross-examination:

"When my attention was directed to the people out on the street, I stepped a little towards the window, and the children stepped a little further to the window. They went the rest of the way. At the time the accident happened I was standing still, and I should judge was about eight feet from the sign. The oldest boy could not see over it readily, and put his hands on top of the sign, raised on his tiptoes to look over, and the signboard immediately gave way. There was no other person nearer the signboard than myself and the two children."

The father testified that soon after the accident he went to the bank. We again quote from the record:

"I went to the bank an hour or better after I heard

of the accident. The sign was then up in the window.

"*Q.* Will you describe as best you can this sign to the jury?

"*A.* Well, I had— I couldn't swear positive as to the exact measurements, but the sign is at least 12 feet long, and it is 22 inches wide over all, and it is bound on the outside with a strip, originally, I think, 3-inch strip, and the edges of it rounded, same as rounded out like that, same as the base of a step, making a binding on the sign hardly the width of that, not quite as wide, and it is paneled around the outside with 6-inch boards, and one panel broke down through the center, and it is at least 22 inches in width and 12 feet long. It is a bank sign, and extends the whole width of the bottom of the window. The window is one piece of plate glass. On that day, when I went to the bank, I made an examination of the sign, with a view of ascertaining what kind of fastenings, if any, had been on the sign.

"*Q.* What did you find as to there being any indications on the sign of how it had been fastened across the window?

"*A.* No indication whatever as to the way it was fastened at the time I looked at it.

"*Q.* That was after it had been put back?

"*A.* Yes, sir.

"*Q.* Were you able to discover that there was anything about the sign that had been fastened to the casing of the window?

"*A.* No."

We think this testimony justified the jury in finding defendant was negligent.

Judgment is affirmed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.